IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIAM PIPER,<br><br>            Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>            Defendant. | CASE NO. 3:22-cv-1006<br><br>DISTRICT JUDGE<br>JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Plaintiff William Piper filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In January 2020, Piper filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of

December 21, 2016,[1] and claiming he was disabled due to knee pain, arthritis, back pain, elbow pain, "low vision" in his left eye and blindness in his right eye, "anger problems," depression, anxiety, "shoulder problem," foot pain, and memory loss. Tr. 225–26, 254, 258. The Social Security Administration denied Piper's applications and his motion for reconsideration. Tr. 66–67, 104–05. Piper then requested a hearing before an Administrative Law Judge (ALJ). Tr. 164.

In January 2022, an ALJ held a hearing. Piper and a vocational expert testified. Tr. 38–65. Five days later, the ALJ issued a written decision finding that Piper was not disabled. Tr. 18–32. That decision became final on April 4, 2022, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Piper filed this action on June 9, 2022. Doc. 1. He asserts the following assignments of error:

1.      The ALJ's residual functional capacity determination is not supported by substantial evidence.

2.      The ALJ erred in not considering all medical opinions of record.

3.      The ALJ erred by not including and evaluating the consultative examination from the plaintiff's prior claim file.

Doc. 9, at 5, 7, 10.

---

[1]      "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Evidence**

*1.    Personal and vocational evidence*

Piper was born in 1969 and was 50 years old on the date he filed his applications. Tr. 30. He graduated from high school and used to work as a conveyer attendant in the pressroom at a Whirlpool factory. Tr. 43–44, 58.

*2.    Relevant medical evidence*[2]

In September 2015, Piper saw a pain management doctor and complained of pain in his lower back and legs. Tr. 349. The doctor's exam findings showed that Piper had an unassisted functional gait. Tr. 349. Piper had tenderness over his lumbar paraspinals and a functional range of motion in his "peripheral joints." Tr. 349. He had 4 out of 5 "muscle power" in his legs and arms. Tr. 349. The doctor diagnosed neuropathic pain, "displacement of the lumbar intervertebral disc without myelopathy," disc degeneration, and lower back pain without sciatica. Tr. 349. The doctor continued Piper's medications. Tr. 349.

Piper had similar exam findings during pain management appointments in December 2015 and February, May, and August 2016, except that he had 4 to 5 out of 5 "muscle power" in his legs with "minimal weakness

_____

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. I note that neither party complied with the Initial Order's instructions to file a fact sheet or chart. *See* Doc. 7, at 2–3. Although the Initial Order was issued by the magistrate judge previously assigned to this case, the Initial Order still governs these proceedings. In the future, counsel must comply with Court orders.

of flexors" at those visits. Tr. 352, 355, 358, 361. In October 2016, the doctor found that Piper's physical maneuver tests "showed evidence of low back pain bilaterally, and tenderness over the lumbar paraspinals." Tr. 364.

In January 2017, Piper saw his pain management doctor and complained of lower back and left elbow pain. Tr. 367. The doctor's exam findings showed that Piper had an unassisted functional gait and a functional range of motion in his "peripheral joints." Tr. 367. Piper had tenderness over his lumbar paraspinals and 4 to 5 out of 5 "muscle power" in his legs. Tr. 367. The doctor's diagnoses included "degeneration of lumbar or lumbosacral intervertebral disc," chronic pain syndrome, neuropathic pain, neurofibromatosis,[3] and lumbar sprain. Tr. 368.

 A May 2017 x-ray of Piper's lumbar spine showed a mild rotational spinal curvature, "[g]rade 1 … spondylolisthesis of L3 on L4 associated with right L3 spondylolysis," and a "failure of posterior element bony fusion … of doubtful clinical relevance."[4] Tr. 573.

---

[3]    Neurofibromatosis is a "familial condition[] characterized by developmental changes in the nervous system and other structures" that causes benign tumors, called neurofibromas. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1265.

[4]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has 7 vertebrae designated as C1 through C7. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited Feb. 22, 2023). The 12 vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. Id. The 5 in the lower spine—the lumbar spine— are L1 through L5. Id. And the 5 vertebrae at the bottom of the spine— in the sacrum—are labeled as S1 through S5. *See* https://www.spine-

Two weeks later, Piper saw an orthopedic doctor and reported moderate pain but no numbness in his left elbow and right knee. Tr. 487. The doctor's exam findings showed that Piper had a normal gait and stance and normal muscle strength in his arms and legs. Tr. 487. Piper had full range of motion in his left elbow and right knee. Tr. 487. X-rays of his left elbow and right knee were normal. Tr. 487. The doctor diagnosed Piper with lateral epicondylitis (tendonitis) in his left elbow and internal derangement of his right knee.[5] Tr. 488.

In July 2017, Piper saw his pain management doctor and complained of lower back and left elbow pain. Tr. 373. The doctor's exam findings and diagnoses were similar to those at Piper's previous visit. Tr. 373–74. The next day, Piper followed up with the orthopedic doctor for his right knee pain and reported left knee pain. Tr. 490. The doctor's exam findings showed that Piper had normal motor strength in his legs, a normal gait and stance, and full range of motion in both knees. Tr. 490–91. The doctor diagnosed Piper with right knee osteoarthritis based on an MRI and internal derangement of his left knee. Tr. 491.

In August 2018, Piper had a counseling appointment and reported difficulty with patience and "thinking and concentration problems." Tr. 1282.

---

health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited Feb. 22, 2023).

[5]     Internal derangement is a partial dislocation of the knee. *See* Dorland's *supra*, at 493.

Piper said that he had never been on medication for those problems and did not want to consider medication. Tr. 1282.

Piper continued to seek treatment for lower back pain. *See*, *e.g.*, Tr. 376, 452. In January 2019, Piper saw his pain management doctor and reported lower back pain which worsened with activity and Piper's job duties. Tr. 1798. The doctor's exam findings showed that Piper had 4 to 5 out of 5 "muscle power," an unassisted functional gait, and functional range of motion in his "peripheral joints." Tr. 1798. The doctor continued Piper's medication. Tr. 1799.

In September 2019, Piper saw his primary care doctor Craig Thompson, M.D., for an annual exam. Tr. 469. Piper reported that he was "generally doing well." Tr. 469. Dr. Thompson wrote that "[u]nfortunately, [Piper] is a smoker." Tr. 469. Dr. Thomson provided Piper with nicotine patches. Tr. 469. Dr. Thompson also wrote that Piper "still drinks alcohol." Tr. 469. Dr. Thompson encouraged Piper to stop drinking alcohol and commented that Piper hadn't been to an area center for his alcohol use "and underlying depression" as recommended and wrote, "we are going to try and get him set up for this once again." Tr. 469. Piper's "main complaint really now is that he has hand pain." Tr. 469. Dr. Thompson ordered hand x-rays, Tr. 470, which showed that Piper was developing mild osteoarthritis at the first metacarpophalangeal (large knuckle) level. Tr. 765.

In December 2019, Piper saw Dr. Thompson for neurofibromatosis. Tr. 475. Dr. Thompson wrote that Piper had diffuse progressive neurofibromas and that Piper complained of neuropathic pain with numbness in his extremities, particularly his hands and feet. Tr. 475. Piper was blind in his right eye. Tr. 475. Dr. Thompson's exam findings showed that Piper had numbness in his hands and feet and normal muscle tone. Tr. 477. A musculoskeletal exam showed a normal range of motion. Tr. 477. Piper reported that for 22 years he worked on the assembly line at Whirlpool Corporation "but he no longer is able to do that type of physical manual labor. He is really not trained to do any other type of work." Tr. 475–76. Dr. Thompson wrote that Piper saw a pain management doctor and that "[o]therwise, he is unchanged." Tr. 475.

In July 2020, Piper saw his orthopedic doctor and received a corticosteroid injection in his right knee. Tr. 1760.

Piper continued to see pain management for back pain. *See, e.g.*, 1634. Lumbar spine x-rays taken in September 2021 were compared to Piper's May 2017 x-rays and showed stable anterolisthesis, mild-to-moderate stable L3-L4 degenerative disc disease, and stable mild curvature of Piper's lumbar spine. Tr. 1643.

In October 2021, Piper saw a primary care physician to establish care. Tr. 1659. Piper reported anxiety, depression, and post-traumatic stress disorder. Tr. 1659. He took Paxil every day. Tr. 1659. Piper said that he was

7

doing "alright currently with some anxiety" and wanted to try a higher dose of Paxil. Tr. 1659. He declined counseling. Tr. 1659. Piper spoke about his history of alcohol abuse—he quit drinking alcohol a month before the appointment and "fe[lt] fine." Tr. 1660. He was motivated to avoid alcohol because otherwise he could not receive pain management medication. Tr. 1634, 1638, 1660.

In November 2021, Piper saw his orthopedic doctor after a right knee "twisting injury." Tr. 1934. A right knee MRI showed a "[c]omplete radial tear posterior horn lateral meniscus with displaced meniscal fragment deep to popliteus tendon, bone contusion lateral tibial plateau and lateral femoral condyle, mild to moderate tricompartmental [osteoarthritis], small joint effusion," and a Baker's cyst. Tr. 1935. The doctor recommend that Piper undergo an arthroscopic procedure and Piper underwent knee surgery. Tr. 1940–41.

3.     *State agency opinions*[6]

In February 2020, William Bolz, M.D., reviewed Piper's record and assessed Piper's physical residual functional capacity (RFC).[7] Dr. Bolz found that Piper could perform medium level work—stand, walk, and sit for about 6 hours in an 8-hour workday and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 112. Piper also had postural, visual, and environmental limitations. Tr. 97–98.

In November 2020, Leslie Green, M.D., reviewed Piper's record and found that Piper's RFC was more restrictive. Tr. 112–14. Dr. Green found that Piper could perform light level work—stand, walk, and sit for about 6 hours in an 8-hour workday and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 112. Dr. Green added that Piper could reach in front or overhead with the left arm frequently and had additional environmental limitations. Tr. 113–14.

---

[6]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

In February 2020, Todd Finnerty, Psy. D., reviewed Piper's record and assessed Piper's mental RFC. Dr. Finnerty found that Piper could comprehend, remember, and carry out simple instructions that were one to three steps but had a restricted capacity to perform detailed, complex tasks. Tr. 81. He could maintain attention, make simple decisions, and adequately adhere to a schedule. Tr. 81. Piper could interact with others on a superficial basis. Tr. 82. He could adapt to a setting with routine and predictable duties; required changes to be well-explained and slowly introduced; and could handle the stresses of routine work that did not involve timed tasks or rate quotas. Tr. 82.

In August 2020, Kristin Haskins, Psy. D., adopted Dr. Finnerty's findings but added that Piper's ability to adhere to a schedule was for simple tasks in a setting without fast-paced demands. Tr. 114–16.

### 4. *Hearing testimony*

Piper, who was represented by counsel, testified at the telephonic administrative hearing. At the time of the hearing, Piper was homeless and staying with a friend. Tr. 42, 53. When asked why he couldn't work, Piper said that he is blind in his right eye and that bright lights strain his left eye. Tr. 45. He has difficulty watching television because his left eye burns and waters. Tr. 45–46. Piper uses eye drops at night. Tr. 45. Being around people causes increased stress and anxiety because he has no patience. Tr. 45. Also, Piper's feet "go[] numb" and his back hurts. Tr. 45–46.

10

When asked if he has problems reading or looking at his phone, Piper answered "a little bit." Tr. 46. He explained that when he reads something he forgets what he read. Tr. 46. When asked about his right shoulder, Piper said that he can reach out in front "a little bit" and that at the time of the hearing he could not "temporarily" reach overhead because it starts hurting "a little bit." Tr. 46–47. Piper estimated that he could lift and carry about 5 pounds on a regular basis. Tr. 47. His elbows are also a problem and he has trouble "[b]ending them and everything." Tr. 47. Like his knees, his elbows "crack and pop." Tr. 47. Piper's fingers "are curling" and feel numb and tingly. Tr. 48. Piper can button his clothes and open jars "and stuff," but then his right hand "by [his] thumb" starts going numb. Tr. 48.

Piper had knee surgery about 2 months before the hearing. Tr. 49. When asked how his knee was feeling, Piper answered that the surgery made his knee worse. Tr. 49. He "barely walk[s] … a block." Tr. 49. Piper's feet "start[] going numb, and it shoots up [his] back." Tr. 49. The doctors told him the numbness would eventually resolve, but it hadn't yet resolved. Tr. 49–50. The doctors gave Piper crutches and Piper was "trying the crutches." Tr. 50. He can go to the store but gets anxious when people in front of him in the checkout line take their time and talk. Tr. 50–51.

Piper explained that he is impatient and his mind is always in a hurry. Tr. 51. But he doesn't "speak out or [anything] because I'm trying to be nice." Tr. 51. Being at the store is the only situation Piper could think of that

11

increased his anxiety. Tr. 51. He then recalled that he also experiences increased anxiety when he drives with a passenger in the car and when a stoplight is red for too long. Tr. 51–52.

Piper stated that he has mood swings and problems remembering things. Tr. 52. When asked about his history of "issues with alcohol," Piper said that he is working on that because it was hurting his family members. Tr. 52. He hadn't had an alcoholic drink in a month. Tr. 56–57.

Piper estimated that because of his hypertension and impatience, he could only sit for about 5 minutes. Tr. 54. He could stand for about 5 minutes before his knees and back start to hurt. Tr. 54. He could walk a block or two before needing a 10-minute break because of back pain. Tr. 54.

The ALJ discussed with the vocational expert Piper's past relevant work as a "conveyer off bearer." Tr. 58. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Piper could perform Piper's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 58–61. The vocational expert answered that such an individual could not perform Piper's past work but could perform the following jobs: folder, cleaner, and sorter. Tr. 59–61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since December 27, 2019, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant had the following severe impairments: Degenerative Disc Disease of the Lumbar Spine, Degenerative Joint Disease, Complex Regional Pain Syndrome, Osteoarthritis of the Right Knee, status/post-Arthroscopic Surgery, a History of Repair of a Rotator Cuff Tear, Blindness of the Right Eye, Depression, Generalized Anxiety Disorder, Alcohol Abuse, and Neurofibromatosis (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he could stand and/or walk for 4 hours; he could sit for 6 hours; he could frequently climb ramps and stairs; he should avoid climbing ladders, ropes, or scaffolds; he could frequently stoop, kneel, crouch, or crawl; he should avoid hazards, such as moving machinery, heavy machinery and unprotected heights; he could frequently reach in all directions with the left upper extremity; he should be able to occasionally use of depth perception and field of vision with the left eye; he should be able to see large print; he should avoid concentrated exposure to extreme cold and vibrations; he should avoid commercial driving; he be able to tolerate simple routine tasks, which can be learned following a brief demonstration or within 30 days; he should avoid work that requires fast pace or strict production quotas; he should be able to tolerate occasional but superficial interactions with others, where superficial is defined as that which is beyond the scope of employment, defined as the performance of job duties and job functions; he could tolerate occasional changes and occasional decision-making in a static work environment, where changes are well explained, and during changes, supervisory support would

be provided during changeover, and he would be off task for up to 20 minutes of the workday in increments of 2–3 minutes at a time.

4.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

5.  The claimant was born [i]n July 1969 and was 50 years old, which is defined as a younger individual age 18–49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

6.  The claimant has at least a high school education (20 CFR 416.964).

7.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

8.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

9.  The claimant has not been under a disability, as defined in the Social Security Act, since December 27, 2019, the date the application was filed (20 CFR 416.920(g)).

Tr. 20–32.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

15

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.    The RFC is supported by substantial evidence*

Piper argues that the ALJ's RFC is not supported by substantial evidence. Doc. 9, at 5. Piper asserts that he can't perform "the standing and walking required for light work," which, Piper contends, is 6 hours in an 8-hour workday. *Id.* at 6. But the ALJ limited Piper to a reduced range of light work—standing and walking for 4 hours a day. Tr. 24. So Piper's argument that he can't stand and walk for 6 hours in an 8-hour workday misses the mark.

Piper asserts that "the record consistently documents [his] difficulties with standing and walking" and recites his history of medical conditions, testimony at the hearing, and imaging results. Doc. 9, at 6–7. But Piper does not identify an error that the ALJ made. He does not challenge the ALJ's recitation of the evidence showing that Piper had an unassisted and functional or normal gait, Tr. 25, 27, unremarkable relevant exam findings, Tr. 25–27, mostly unremarkable imaging results except for his right knee in late 2021, for which he underwent surgery, Tr. 26–28, or the ALJ's remark that Piper "travels by walking," Tr. 23. The ALJ's RFC is supported by substantial evidence.

*2.    The ALJ did not err by not discussing Dr. Thompson's opinion*

Piper argues that the ALJ erred because she "failed to mention or analyze the treating physician's opinion in her decision." Doc. 9, at 9. Piper

17

identifies the following February 2018 treatment note written by his primary care provider, Dr. Thompson:

> William Piper is here today. He has underlying neurofibromatosis. He has right eye blindness from a tumor dating back to age 5. He does have low back pain and lumbar degenerative disc disease. He sees a pain doctor, Dr. Iskander, who is also a physiatrist. The patient last worked 12/16/2016. He was working at Whirlpool and was fired due to poor attendance or at least an issue with the FMLA. I am not exactly sure how this happened, but he has not been able to work since. He complains of problems with being able to focus. He does describe some depression symptoms. He mostly complains of left low back pain. He does have some vague chest discomfort as well, so will get a chest x-ray. We will do pertinent laboratory studies on him as well. He does have some underlying anxiety and lack of focus, so there may be some element of depression. *I am going to have him go back to see Dr. Iskander and have Dr. Iskander assess him as far as potential disability goes. He does have underlying neurofibromatosis, but this does not really appear to be that significant, does not appear to be debilitating enough to where he would be able to get disability.* He does have a lot of arthralgias, complains of pain in his knees and other joints, *but really examination does not show any significant abnormality there.* He does have the neurofibromas as mentioned previously, I will see him in approximately 3 months. Will do pertinent laboratory studies and also get a chest x-ray. *I am going to tell him to talk to Dr. Iskander about the possibility of getting him set up for disability, but really I think the patient could do some type of clerical work or sedentary work, but I am not sure if he is trained to do that or whether he would be able to do that and get trained for such a job.*

Tr. 447 (emphasis added); *see* Doc. 9, at 9. The ALJ did not discuss Dr. Thompson's comments.

The ALJ's failure to discuss Dr. Thompson's comments was not error because Dr. Thompson's comments aren't a "medical opinion." The regulations define a *medical opinion* as:

> … a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> > (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)….

20 C.F.R. § 404.1513(a)(2)(i).

Dr. Thompson didn't assess Piper's ability to perform functional work activities. *See id*. In fact, Dr. Thompson said that he would refer Piper to Piper's *pain management doctor* for a disability assessment. Tr. 447. Dr. Thompson's belief that Piper "could do some type of clerical work or sedentary work" is not an opinion because Dr. Thompson didn't use terms describing functional activities. *See* 20 C.F.R. § 404.1513(a)(2)(i). And Dr. Thompson's reference to "sedentary work" runs afoul of an additional regulation defining appropriate opinion evidence. 20 C.F.R. § 416.920b(c)(vii) says that "statements about what [a claimant's] residual functional capacity is using our programmatic terms about the functional exertional levels [like *sedentary work*] instead of descriptions about [a claimant's] functional abilities and limitations" are "inherently neither valuable nor persuasive."[9] Indeed, "[t]he

---

[9]      20 C.F.R. § 416.920b(c)(vi) references "the function exertional levels in Part 404, Subpart P, Appendix 2, Rule 200.00," which, in turn, identifies "sedentary, light, medium, heavy, or very heavy work." *See also* Soc. Sec. Ruling 83-10, at \*2 (Jan. 1, 1983) ("In Appendix 2, work in the national

Agency "will not provide any analysis about how [it] consider[s] such evidence in [its] determination or decision." *Id.* at § 416.920b(c).

The ALJ adhered to these regulations. Tr. 28 (ALJ explaining that she "will not provide any analysis about how [she] considered" opinion evidence of Piper's RFC in "programmatic terms instead of descriptions of functional abilities and limits" because doing so is "precluded by the governing regulations"). The ALJ's decision to not discuss Dr. Thompson's comments was not error.

###### 3.     *The ALJ did not fail to develop the record*

Finally, Piper argues that the ALJ erred by not including in the record and evaluating a psychological consultative examiner's opinion that was "in the current and prior claim files." Doc. 9, at 10. Piper explains that the state agency reviewers "noted a prior consultative examination[] performed on May 7, 2019," 8 months before Piper filed his current application. *Id.* Piper recites the Agency's summary of that exam and complains that "the ALJ failed to recognize the recent and relevant opinion of the consultative examiner, nor did she make this opinion a part of the record." *Id.* at 10–11. As a result, Piper argues, he did not get a "full and fair hearing." *Id.*

The ALJ has a duty to develop the record. *See Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). "[U]nder special

---

economy is classified exertionally as sedentary, light, medium, heavy or very heavy").

circumstances—when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures—an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051–52). There is no bright line test; instead, a court decides the issue on a case-by-case basis. *Lashley*, 708 F.2d at 1052.

Piper's argument fails. At the start of the administrative hearing, the following exchange occurred:

> ALJ: …. It looks like we have Exhibits 1A through 18F. Does that complete the file?
>
> ATTY: Yes, Your Honor.
>
> ALJ: Thank you. Those exhibits will be admitted and the record will now close.
>
> *(Exhibits 1A through 1BF, previously identified, were received into evidence and made a part of the record.)*

Tr. 40.

At the hearing, Piper was represented by counsel and counsel confirmed that the record was complete. Tr. 40. Piper does not show that the ALJ failed to develop the record. *See Lashley*, 708 F.2d at 1052; *see also Clason v. Comm'r of Soc. Sec.*, No. 3:15-cv-1171, 2016 WL 4411340, at *8 (N.D. Ohio July 19, 2016) (rejecting the claimant's argument that the ALJ violated his duty to develop the record when the claimant was represented by counsel, counsel told

the ALJ that the record was complete, and the ALJ did not promise to obtain further records).[10]

In any event, the state agency reviewers relied on the May 2019 consultative exam to support their RFC assessment, Tr. 89, 109; the ALJ found persuasive the state agency reviewers' opinions; and Piper doesn't show that the ALJ's generous mental limitations in the RFC were inconsistent with those opinions.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: February 22, 2023

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

---

[10]    Report and recommendation adopted, 2016 WL 4400732 (N.D. Ohio Aug. 18, 2016).

22